[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
I.
Introduction and Factual Background
 A.
In 1973, the defendant Gavlick Realty Company purchased the buildings and land at 100 Franklin Street, Bristol, Connecticut. The site was formerly General Motor's New Departure plant and consisted of several buildings totaling 500,000 square feet on a thirty acre parcel. The principals of Gavlick Realty also own an international heavy machinery trading business known as Gavlick Machinery Corp., the other defendant herein which operated from said site (hereinafter, unless otherwise designated, collectively referred to as "Gavlick"). In December 1986, Gavlick Realty sold a portion of the premises, namely, Buildings 85 and 86 to the plaintiff R.G. International Group (hereinafter, referred to as "R.G.I."), a partnership comprised of Ernest Robertson and Cyril Gruber, for the sum of $3,000,000.00. The purchase was financed through a $2,200,000.00 loan from City Trust and a $1,000,000.00 second CT Page 6849 mortgage to Gavlick Realty. Additionally, the parties agreed to a lease back arrangement in which Gavlick Realty would remain in the office building portion of Building 86 for 15 years at a monthly rental equal to the mortgage payment. Gavlick Machinery also agreed to rent a small portion of building 86 for a relatively short period of time.
 B.
The present case concerns disputes arising out of the lease entered into in December 1986. This action was commenced on July 27, 1988 (the "first" suit) and from the outset the defendants attempted to enforce the arbitration clause found in paragraph sixteen of the lease. Thus, on November 22, 1988, the matter was stayed for 60 days to allow the parties to proceed with arbitration. As a result of the plaintiff's failure to commence arbitration proceedings, the defendants herein instituted a second proceeding (the "second" suit) in March 1989 seeking an order requiring the plaintiff to arbitrate. An answer with special defenses was filed on June 19, 1989. On October 11, 1989, Gavlick filed an answer together with special defenses, a set off and a counterclaim in the first suit. Gavlick then filed a Motion for Stay in the second suit seeking again the opportunity to arbitrate. Said request was granted, Aronson, J., on May 16, 1990. On August 7, 1990, Gavlick again arbitration by its Motion for Default. On September 25, 1991, this court granted Gavlick's application to proceed with arbitration ordering each side to appoint an arbitrator by October 16, 1991, with a third to be appointed by said arbitrators on or before October 30, 1991. R.G.I. failed to comply with said order and on December 5, 1991, this court ordered both cases to be consolidated for trial.
As a result of Gavlick's consent to waive its rights to arbitration and proceed with trial, the second suit became moot and was subsequently withdrawn at oral argument on May 22, 1922.
 II.
Discussion
 A.
Breach of Contract
1.
R.G.I.'s complaint is divided into four counts: breach of contract, nuisance, trespass, and tortious concealment. CT Page 6850 Gavlick's counterclaim is for breach of contract. To the extent the respective claims overlap, this court will discuss them together. a.
Paragraph 7(a) of R.G.I.'s complaint and paragraph 5(c) of the Gavlick counterclaim concern the warehouse space rented to Gavlick Machinery under paragraph twenty four of the lease. R.G.I. alleges and Mr. Gruber testified that Gavlick had not paid any rent for the period January 1, 1987 through June 30, 1988. The evidence indicates that rent was paid through June 1987 (Exhibit L) at which time Gavlick stopped paying rent as a result of a breakdown in discussions with R.G.I. over other problems. Paragraph twenty four indicates that Gavlick would lease the space (rear portion of Building 86) until NorthEast Rubber Company ended its lease. The testimony indicated the NorthEast moved out early (February 1987) with a formal termination in October 1987. The testimony was not exactly clear as to when Gavlick learned of the termination but it did not move out until June 1988.
Gavlick has pointed out that it was denied full access to the space due to a lock installed by R.G.I. between its space and that of NorthEast. This court did not hear any conclusive testimony as to whether the locked door happened on more than a few occasions, or whether it caused any financial or other damage. The court notes that rent was paid during the first six months and the testimony of Mr. Gruber is that NorthEast moved out in February 1987 (although Mr. Gavlick testified NorthEast moved in June 1987. While this court believes it may have been a temporary nuisance, it does not believe that the locked door constituted a constructive eviction. See Johnson v. Fuller, 190 Conn. 552, 559 (1983). Gavlick thus owes R.G.I. $2,467.00 a month for 12 months or $29,604.00 use and occupancy for said paragraph twenty four space.
 b.
R.G.I.'s second complaint was that Gavlick made major and substantial alterations to its premises in violation of the lease. This court heard and received testimony of a sublease in the office building which required the installation of temporary partitions (Exhibit E). Indeed this court viewed the partitions. To the extent that Paragraph Five of the lease allows Gavlick to assign or sublet without obtaining approval and that Paragraph Six allows the tenant to "construct internal partitions and to make improvements to the floors, ceilings . . . and improvements . . . without the prior written consent of the landlord," R.G.I. has failed to prove this count. In its brief, R.G.I. admitted it had failed to prove these allegations. CT Page 6851
 c.
R.G.I. has alleged in paragraph 7(e) that Gavlick sublet a portion of the premises to a tenant whose business violates the Bristol Zoning Regulations. As no evidence was introduced on this issue, the plaintiff has not proved this count. Like the previous allegation, R.G.I. has abandoned this claim in its brief.
 d.
R.G.I. has alleged in paragraph 7(f) that Gavlick damaged an overhead door, a brick wall, fences, gates and an alarm system. R.G.I. has failed to meet its burden on proving liability or damages on this issue.
 e.
R.G.I. has alleged in paragraph 7(h) that Gavlick has not paid its share of real estate taxes. R.G.I. sent a tax bill on July 12, 1988 for taxes January 1, 1987 to June 30, 1988. (Exhibit M). Gavlick objected to the calculations and set forth its estimation of taxes in a July 21, 1988 letter (Exhibit N). R.G.I. responded in a July 27, 1988 letter (Exhibit 12) in which it explained the earlier calculations. Essentially, R.G.I. was seeking payment for the office building, the Building 86 space, and a proportionate share of the land and pavement liability. Paragraph twenty two of the lease specifically indicates that the tenant "shall pay all real property taxes assessed against the office building." Gavlick estimated those taxes to be $10,500.00 while R.G.I. has allocated $7,856.67 or $654.72 per month or, for 18 months, $11,785.00. Gavlick is liable for $11,785.00 for that period and $666.00 thereafter or $31,968.00 ($666 x 48 months).
 f.
Both R.G.I., in paragraph 7(i), and Gavlick, in its counterclaim, have alleged that the other is owed for snow removal. Mr. Gavlick testified that he had to pay his own employees and others to remove snow as R.G.I. failed to perform under Paragraph Four (3) of the lease. Gavlick billed R.G.I. $931.90 for its payments to Kopcha Construction and requests $72.21 for Gavlick employees' time. (Exhibits F; G). R.G.I. has failed to introduce evidence on this issue and has in fact conceded this issue in its brief. This court awards said amounts to Gavlick.
g. CT Page 6852
Most of the trial concerned issues involving electrical service to the R.G.I. property. The plaintiff's buildings were, of course, just part of the total industrial complex. Apparently, they were initially served by a now abandoned, but formidable power plant to the rear of the property. At the time Gavlick purchased the property, power was provided by Connecticut Light Power (CLP) to a small powerhouse known as B-73. (Exhibit H). An underground line from B-73 to a KVA transformer on the westerly side of the R.G.I. building (B-86) provided power to R.G.I.'s buildings. The powerhouse, B-73, was not part of the sale to R.G.I. and the agreement of the parties was that "the costs of separating electric service and installing separate electric service and meters to the factory and also the office shall be paid for by the landlord. Until such separation and installation is completed, electrical charges shall be apportioned in an equitable manner to be mutually agreed upon." (Exhibit C, pp. 3-4). It was this provision that propelled the parties into this litigation.
Mr. Gavlick testified that when his company purchased the complex, power to the office building was supplied by several lines. Gavlick modernized the electrical service to the office building by installing a new switch gear and distribution center. (Exhibit E). Despite requests by Gavlick, R.G.I. did not make any attempt to separate the electrical service until April 1988. During that interim time, the parties were totally unable to apportion the electrical bill which was still in Gavlick's name. The problem was caused in part by the initial statements sent by Gavlick to R.G.I. (Exhibit G) showing Gavlick's portion to be significantly smaller than its actual usage. For instance, the March 1987 bill (February 6-March 4) showed a usage of 72000 kilowatt hours with a charge of $5,714.48. Gavlick broke this down showing R.G.I.'s tenants' owing $2,536.64:
 NorthEast Rubber $ 695.25 National Standard 1,428.66 Risdon 301.61 Gavlick 111.12 --------
$2,536.64
The balance of the bill was charged to the Narang complex.
This situation continued for a number of months with the parties arguing over the appropriate percentages. During this period, Gavlick was paying CLP the full amount of the bill which included not only its share, whatever that may have been, but also R.G.I.'s share including R.G.I.'s tenants' CT Page 6853 shares. The testimony indicated that while both parties did attempt to resolve the usage dispute, they were unable to arrive at a fair figure. However, R.G.I. refused to contribute any money and did not attempt to install a separate service. At the same time, R.G.I. had contracted with its own tenants to collect for that electrical usage. Mr. Gruber testified that R.G.I. sued National Standard in 1988 for electrical usage for 15 months, January 1987 to March 1988, at approximately $1,400.00 a month. The case was settled in R.G.I.'s favor and still R.G.I. did not pay any money to Gavlick.
Mr. Gavlick testified that his company did acknowledge that the initial Gavlick usage figures were too low and offered to pay $750.00 toward each bill. Gavlick enlisted CLP to assist in determining the appropriate usage and the $750.00 usage figure was deemed correct.
The usage dispute was further complicated by the accuracy of the metering system. R.G.I. did not trust the G.M.C. meters, in part, because of their age, but also because during a test of the factory usage, the meters kept running even though the power had been shut down. As R.G.I.'s tenants vacated and as R.G.I.'s usage turned to cold storage only, its position became hardened on the appropriate percentage of electric bills that did not substantially decrease.
In February 1988, the issue was compounded by a break in the line from B-73 to B-86. Mr. Gavlick testified that R.G.I. wanted Gavlick and National Standard to participate equally in the cost of repair but Gavlick refused since the lease made this R.G.I.'s obligation. As R.G.I. did not make the repair, Gavlick ran its generator which supplied power to the whole easterly complex. The generator had been prewired into the electrical system and required minimal installation. Gavlick utilized LaVallee Electric Co., the electrician for both parties, to start the generator. While R.G.I. claimed that the start up was premature, that the connection damaged the building, and that R.G.I. should have been able to procure its own generator, the testimony indicates that the use of this generator was not only necessary but proper. R.G.I. made no serious attempt to either restore electricity or obtain emergency power. Indeed, R.G.I., along with its tenants, benefitted [benefited] from the Gavlick system, as it had been benefitting [benefiting] up to that time. R.G.I.'s claim in paragraph 7(g) that LaVallee Electric was hired without permission cannot be sustained.
The generator was used until April 6, 1988 at a total cost for the operation, both fuel and maintenance, of $27,167.50 (Exhibit G). CT Page 6854
In April 1988, R.G.I. finally had CLP install power to its property and place the service in its name. The cost for the installation was $22,676.00. Service remained in R.G.I.'s name until January 1990 when, according to Mr. Gruber, it was canceled. Mr. Gavlick testified that four months after the April installation the parties were again disputing the relative usage and that after threats from CLP of a cut off, Gavlick paid $5,600.00 in September 1988. Gavlick made further payments during this period including a $3,368.99 to CLP in November 1988, $6,000.00 to R.G.I.'s attorneys in May 1989 and $5,000.00 to CLP in October 1989 (Exhibit O) for a total of $20,416.19. He testified that the May 1989 payment was made to avoid a threatened power shutoff and that in January 1990 power was placed again in Gavlick's name. Both Mr. Gruber and Mr. Gavlick testified that in January 1990, Gavlick offered to pay $1,000.00 per month. Power has remained in Gavlick's name since that time.
In April 1989, R.G.I. finally had a submeter installed to ascertain the exact usage of the office building. It did not resolve the dispute and Mr. Gruber stated that it was faulty. A second submeter was allegedly installed which also did not work. Mr. Haba testified, on the other hand, that he inspected and read the submeter when it was installed and that upon subsequent readings, the serial numbers never changed. He further stated that it had never been reset and that utilizing the multipliers on the meter and a .10 kilowatt charge, the average monthly use was $800.00.
It is clear from a review of the electric bills that the monthly charge never totaled just $800.00. The bills were always substantially more. Messrs. Gavlick and Haba testified that the additional amounts were based on both a demand charge and on a continued energy drain in the factory. This court did not receive any testimony from CLP or any other expert on this issue but it appears, from a review of the bills, that in addition to the actual energy usage, the customer was charged both a service charge and a demand charge. Returning to the March 1987 statement with a $5,714.48 total charge, $3,762.00 was the energy charge and $1,754.00 was the demand charge. As explained by Mr. Gavlick, the customer is allocated an amount of electricity at all times which results in the demand charge. Mr. Gruber was not familiar with this added charge. Further, as mentioned by Gavlick in its brief, this court did indeed see lights on in the factory during its view. This would substantiate the explanation made by the Gavlick representatives concerning the demand charge and the energy drain. This court also recalls Mr. Gruber's testimony that he did not review the electric bills prior to purchasing the complex. CT Page 6855
This court, as indicated, heard several days of testimony on issues concerning the electric bills. On balance, the two Gavlick witnesses were more credible than R.G.I.'s representative — perhaps, in part, because of their familiarity with the premises and their having a greater knowledge of this general issue. Mr. Gruber was not on the premises every day and his partner, Mr. Robinson did not testify. This court concludes therefore that R.G.I. owes Gavlick damages as set forth below:
I. Electric Bills
 1. January 1987-March 1988 Total Bills $35,049.00 Less Gavlick ($800/mo.) 12,000.00 _________
Total Due Gavlick $23,049.00
 2. April 1988-December 1989 Totals Bills $22,676.00 Less Gavlick share 16,800.00 __________
 Gavlick Actually Paid: $20,416.00 16,800.00 __________
Total Due Gavlick $ 3,616.00
 3. January 1990-December 1991 Total Bills $36,818.78 Less Gavlick ($1,000/mo.) 12,000.00 __________
$24,818.78
 4. January 1992-March 1992 Never Billed -0- ----------
Total Due Gavlick $51,483.97
II. Generator Charges (Exhibit G)
 Usage, fuel, labor $27,167.50 Plus 10% overhead 2,716.75 ___________
$29,884.25 CT Page 6856 less Gavlick 800 x 2.5 2,000.00 __________
$27,884.25
Total Due Gavlick $27,884.25
Finally, R.G.I. has made a claim in paragraph 7(d) that Gavlick has failed to pay its proportionate share of the cost of installing the new electric service. Paragraph Four (4) of the lease does not require this payment and the plaintiff has acknowledged this fact in its brief, p. 26.
 B.
Nuisance
R.G.I.'s second claim alleges that Gavlick has created and maintained a nuisance by storing its machinery on R.G.I.'s property. R.G.I. maintains that the storage of the machinery has prevented R.G.I. from renting its property.
As noted, this court viewed the premises and there is no question but that Gavlick is storing its machinery around the R.G.I. building. The machinery however, is mostly stored on Gavlick's property or on its right of way which surrounds the building. As noted by Mr. Gavlick in his testimony, no machinery is stored at the southwesterly corner of the building near the office. Thus, when one enters the R.G.I. complex, the machinery is not evident. One has to walk up a fair incline, to the Narang building, to see the machinery.
R.G.I. has characterized the machinery as "junk". This court does not reach the same conclusion. All pieces are tagged, some are covered with plastic and some are boxed. In a sense it is a graveyard — but Gavlick is in the business of selling used machinery. As indicated from the testimony, it is an international operation. While some of the machinery may be of questionable value, this court received no evidence on any specific piece and cannot reach the conclusion that Gavlick is maintaining a junk yard. This court is well familiar with steel scrap yards.
At the same time, this court did see evidence of boxes and other cardboard material, consistent with that found in R.G.I.'s interior space, in large piles in the rear of B-85. A junked car was also seen in one of these piles. (Exhibit E). The Gavlick machinery stands in stark contrast to the empty cavernous space of B-85 and B-86. CT Page 6857
A claim for nuisance requires proof of four elements: (1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; (4) the existence of the nuisance was the proximate cause of the plaintiff's injuries and damages. Filisko v. Bridgeport Hydraulic Co., 176 Conn. 33, 35-36
(1978). The plaintiff has failed to prove each element and accordingly, this claim must fail.
 C.
Trespass
R.G.I. has alleged that Gavlick has committed trespass on its property by entering onto its land during the power outage to operate the generator, remaining in the Gavlick machinery space after the lease expired, altering walls, damaging property, and by placing machinery and dumpsters on R.G.I.'s property.
1.
In its brief, R.G.I. acknowledges that it did not prove the allegations that Gavlick committed trespass by entering the property to start the generator or by altering walls.
2.
This court has previously discussed the issue of the Paragraph twenty four space leased for Gavlick machinery. As Gavlick was indeed permitted to enter the contracted space initially, no trespass occurred. General Statutes Sec. 53a-110a; State v. Mention, 12 Conn. App. 258, 260 (1987).
3.
The allegations that Gavlick damaged certain property when removing its machinery do not constitute trespass.
4.
 a.
The final claim of trespass concerns the placement of machinery and dumpsters on R.G.I.'s property without permission. The court heard some testimony concerning dumpsters but is convinced that the plaintiff has not sustained its burden on this issue. The placement and storage of machinery is a different CT Page 6858 matter. The court's view clearly showed that Gavlick does indeed have some machinery on R.G.I.'s property. As mentioned, the sides and rear of the building are surrounded by stored machinery. In some instances, it is clear that Gavlick has crossed its property lines and is storing machinery on R.G.I.'s property. R.G.I. has admitted that it seeks no monetary damages for this trespass and, as such no monetary damages are awarded. R.G.I. has sought injunctive relief seeking the removal of such machinery and this court agrees that such relief is appropriate. Gavlick is therefore ordered to remove all outside machinery now stored on R.G.I. property within one month from the date of this decision.
 b.
Mr. Gruber also testified concerning the unlawful storage of machinery in B-85. Mr. Gavlick testified that he and Mr. Haba offered to rent the space in August/September 1991 but that Mr. Robertson advised them that as the bank was taking the property, he did not care whether they utilized the space. They also spoke to a bank official, Mr. Grant, and sought his permission. Upon request by Mr. Gruber, in October 1991 Gavlick moved some of the machinery until the doors were locked. This court cannot find that trespass was committed.
 D.
Tortious Concealment
1.
The plaintiff finally seeks damages on allegations that Gavlick intentionally or negligently concealed or misrepresented information concerning the oil burner, a compressor, an elevator, a sprinkler system, an air conditioning system and the rental payment delinquency of two tenants. The plaintiff concedes in its brief that it did not offer proof on the oil burner or elevator.
As to the air conditioner, it is not contested that R.G.I. did spend $14,000.00 for repairs including a new compressor. It is also true that Gavlick paid $7,000.00 for repairs to the system. The contract of sale, paragraph 3(e) represented that "all utilities required for present operations . . . are connected and operating." Paragraph 3(g) limited such representation to six months from closing. While the court heard testimony that the $14,000.00 repair was made in 1987, the court does believe it received evidence as to the exact date. More importantly, however, this court finds that the plaintiff has not sustained its burden of proof in showing that CT Page 6859 Gavlick concealed information about the system. "The intentional withholding of information for the purpose of inducing action has been regarded, however, as equivalent to a fraudulent misrepresentation." Pacelli Bros. Transportation, Inc. v. Pacelli, 189 Conn. 401, 407 (1983). Fraud must be proven by a standard more exacting than a "fair preponderance of the evidence," Alaimo v. Royer, 188 Conn. 36, 39 (1982); it must be proven by clear, precise and unequivocal evidence. Id. The only evidence in this case is the blanket warranty of the contract for sale (Exhibit A-1) and the testimony of the repairs (both by R.G.I. and Gavlick). That is simply not enough evidence to meet this higher standard of proof. It is entirely conceivable that the air conditioning system was operable at closing. This court recalls the paucity of evidence on R.G.I.'s investigation into this building prior to its purchase.
2.
A similar allegation was made concerning the sprinkler. This court recalls no evidence being introduced on this issue.
3.
The final claim of concealment concerns misrepresentations about the rental payment status of one tenant. At closing, Irene E. Gavlick, a partner of Gavlick Realty, provided an affidavit concerning the status of the existing leases.
Paragraph 3 indicated, inter alia, that the list of leases attached to the affidavit were in full force and effect and that "no defaults exist on the part of either party thereto." The list included four leases: Roosevelt Building Products, Risdon Corp., National Standard Company, and NorthEast Rubber Company. The list further showed the security amount but no other information was provided. Mr. Gavlick testified the leases were assigned to R.G.I. and certain information was attached as Schedule E to Exhibit A.
As indicated, NorthEast Rubber vacated in February 1987, without paying its rent. Mr. Gruber testified that Gavlick's foreman told him that NorthEast Rubber was four months delinquent at the time of the sale and that he (the foreman) had helped move NorthEast out of the premises. Mr. Gruber confronted Mr. Gavlick about this on one occasion.
R.G.I. is not claiming damages against Gavlick for the full term of the lease; nor is it even seeking a recission of the contract for the misrepresentation. Rather, it is seeking damages for the equivalent of two months of NorthEast's CT Page 6860 rent.
Mr. Gavlick did not rebut or offer any evidence on the status of NorthEast's rental payments. The affidavit, however, indicated Gavlick's tenants were not in default and the closing statement (Exhibit I) includes a rent adjustment in favor of R.G.I. for the four leases. The amount for NorthEast is $87.70 or one day's (December 31, 1986) rent at a monthly rental of $2,718.75. This could suggest that North East was current for December or, if it was not current, Gavlick was at least adjusting as if it was not in default.
The burden of proof on this issue is clear and convincing evidence. Alaimo v. Royer, supra. While the affidavit is clear, the plaintiff has not met its burden of proof. This court heard an insufficient amount of evidence on this issue, including whether R.G.I. investigated and relied on the income flow from the four tenants (or five, including Gavlick Machinery) in consummating this contract. No damages are awarded.
 E.
Gavlick's Counterclaim and Set Off
1.
A number of issues in Gavlick's counterclaim have been previously addressed. (Paragraphs 5a-f, 5h-j, 51-p). The remaining claims will be addressed in this section.
2.
Paragraph 5g alleges a claim that Gavlick suffered damages from the power outage which reduced its ability to maintain contact with its international clients. No evidence was submitted on this issue and this claim fails.
3.
Paragraph 5k alleges a breach of contract for R.G.I.'s failure to furnish a copy of the insurance policy. The lease, at paragraph twenty-three, requires an exchange of insurance policies or certificates of insurance. Thus, there is no requirement to provide a copy of the insurance policy. As Mr. Gruber testified that the certificate was provided, this claim fails.
4.
Paragraph 5m alleges a breach of contract for CT Page 6861 R.G.I.'s failure to maintain ground and lawn appearance resulting in lost opportunities to lease office space. Gavlick did present evidence on R.G.I.'s failure to maintain the grounds as it incurred costs with Bruno's Landscaping of $1,457.80 plus tax of $117.16 or $1,574.96. (Exhibit G). Gavlick is awarded this sum as damages. Gavlick did not present any evidence that the failure to maintain resulted in lost opportunities to lease its office space and thus it fails on this particular claim.
5.
Paragraph 5n alleges a breach of contract for R.G.I.'s failure to maintain the air conditioning which caused computer operating problems for Gavlick. There was certainly evidence presented on air conditioning problems — including repairs performed by both R.G.I. and Gavlick. The lease, paragraph four, requires the owner (R.G.I.) to make repairs and if the owner fails within a reasonable time, tenant has the right to make such repairs and deduct the cost from its rent. During the trial, R.G.I. argued that paragraph four (1) allowed the owner 30 days after notice to make such repairs. This court does not agree with this interpretation. A thirty day period, under these circumstances, in August, was not as reasonable as possible. R.G.I. may well have been dissatisfied with the condition of the air conditioning system, but it could not sit on needed repairs. At the same time, the tenant's right to make repairs and deduct the same from its rent was contingent upon notice by the tenant. There was no evidence that R.G.I. simply refused to repair the air conditioning system. In this case, Gavlick chose to hire third parties to make repairs without notice to the landlord. As Gavlick failed to comply with the lease provisions and as the parties were still meeting and discussing problems, Gavlick cannot prevail on its claim for reimbursement.
Gavlick did not present any evidence of any computer problems and damages therefrom. Likewise, no claim was made in the pleadings for reimbursement for the cost of air conditioning repairs.
6.
Paragraph 5 alleges a breach of contract for R.G.I.'s alleged misrepresentation to a tenant concerning the ownership of outside space. No evidence was presented on this issue.
7.
Paragraph 6 alleges that R.G.I. has failed to pay the CT Page 6862 sums due under the note and mortgage. The note provides that in the event of default of a condition of the note or the mortgage, and such default continues for a period of thirty days, then at the option of Gavlick, the note can be accelerated, if Gavlick is not in default. Paragraph 8 of the mortgage provides similar language. It is clear from the evidence that R.G.I. breached its duty to pay taxes as set forth in paragraph four of the mortgage and that action constitutes a default under the note. The note may not be accelerated, however, if "the tenant is in default under the terms and conditions of the lease." While this court has noted that Gavlick breached its duty to pay taxes, it does not deem such action to be a prohibition to the exercise of this default clause. First, R.G.I. did not reasonably attempt to resolve the tax dispute on the first bill. Second, R.G.I., as owner and responsible for most of the tax bill, never paid any money to the town. Third, it is clear to this court that Gavlick was entitled to withhold such payment as a setoff for the electric bills that were not being paid by R.G.I. Thus, this court finds that as a result of the aforementioned breaches, the note may be accelerated. Gavlick introduced an amortization schedule (Exhibit K) reflecting payments on the mortgage. As previously indicated, the mortgage payments are exactly the same as the rental payments and thus the parties eventually concluded that actual payments were not necessary. Indeed the note anticipates that rental payments may be set off against mortgage payments. As of July 1992, the total principal due is $760,490.39.
The note, however, has a built in limitation on collection of sums due. The holder may only look to "the security of the premises mortgaged herewith." Thus, under this provision, Gavlick may not sue the R.G.I. partners individually to collect any monies owing; Gavlick must foreclose on the mortgage. Paragraph thirteen of the lease states, however, inter alia, that:
 "[I]n the event, however, that this lease shall terminate through operation of law or any other reason beyond Tenant's control, Landlord agrees to indemnify and save Tenant harmless from any loss suffered by it as a result thereof, up to a maximum amount of the principal balance then due under a mortgage of even date between Landlord and Gavlick Realty Company."
This court heard evidence that the City of Bristol has commenced suit to foreclose tax liens on the property. According to the testimony of Mr. Gruber, the liens total approximately $200,000.00 and, while R.G.I. has the intention of paying, it CT Page 6863 does not have the ability. Both parties indicated the foreclosure proceeding has not yet gone to judgment and thus, the lease has not been extinguished by operation of law.
This court also does not believe that either party considered the lease to be terminated. There were allegations of a number of lease violations but the parties have sought their remedies according to traditional contract theories, SHVC, Inc. v. Roy, 37 Conn. Sup. 579, 585 (1983). There is no evidence that either party considered the lease to be null and void. Since this court does not find that a total breach exists at this time, the indemnification provisions of paragraph thirteen does not apply at this time.
To summarize, the note may be accelerated. Collection, however, may only be against the property. As long as Gavlick remains on the property, the amount due under the note shall be reduced by a sum equal to the rental payment as reflected in Exhibit K (which is hereby attached to this decision).
8.
Attorney's Fees
This court awards attorney's fees to the defendant Gavlick. It does so, in part, because of the provisions in the note and also in part because of the defendant's refusal to comply with the arbitration orders as entered by Judge Aronson and this court. Gavlick is awarded attorney's fees in the sum of $35,000.00.
 III.
Conclusion
This court concludes that judgment shall enter for the defendant Gavlick on plaintiff's complaint and its counterclaim as follows:
Issue Plaintiff Defendant
 A. 1) Paragraph 24 rent $29,604.00 2) Real Estate taxes 43,753.00 3) Snow removal $ 1,004.11 4) Electric service 51,483.97 5) Generator costs 27,884.25 6) Concealment — — 7) Lawn Service 1,574.96 8) Attorneys fees 35,000.00 CT Page 6864 __________ ___________
Subtotal $73,357.00 $116,947.29
B. 1) Acceleration of note $760,490.39 (recovery limited to foreclosure proceedings only at this time.)
C. Totals due defendant: A. $ 43,590.29 B. $760,490.39
Defendant is awarded costs.
MARSHALL K. BERGER, JR. JUDGE, SUPERIOR COURT
 NOTE RECEIVABLE — RGI Schedule of PMTS — Summary
Yr Interest Total Pmt of Note Rate Income PMT Note Receivable .0825/Yr Receivable Balance .006875/Mo
BEG. BAL 1/1/87 $1,000,000.00
1 1987 $81,187.61 $116,418 $35,230.39 964,769.61 .006875 2 1988 78,168.65 " 38,249.35 926,520.26 3 1989 74,890.99 " 41,527.01 884,993.25 4 1990 71,332.45 " 45,085.55 839,907.70 5 1991 67,468.97 " 48,949.03 790,958.67 6 1992 63,274.43 " 53,143.57 737,815.10 7 1993 58,720.43 116,418 57,697.57 680,117.53 8 1994 53,776.21 116,418 62,641.79 617,475.74 9 1995 48,408.15 116,418 68,009.85 549,465.89 10 1996 42,580.38 116,418 73,837.62 475,628.27 11 1997 36,253.09 116,418 80,164.91 395,463.36 12 1998 29,383.58 116,418 87,034.42 308,428.94 13 1999 21,925.42 116,418 94,492.58 213,936.36 14 2000 13,828.15 116,418 102,589.85 111,346.51 15 2001 5,071.49 116,418 111,346.51 -0- __________ _______ __________ __________
$746,270.00 $1,746,270 $1,000,000.00 -0-
1987
 Interest Pmt of Note Income Note Receivable CT Page 6865 Receivable Balance
1987 1,000,000.00
Jan $6875.00 $2826.50 997,173.50 x .006875 + 9701.50 — x Feb 6855.57 2845.93 994,327.57 Mar 6836.00 2865.50 991,462.07 Apr 6816.30 2885.20 988,576.87 May 6796.47 2905.03 985,671.84 June 6776.49 2925.01 982,746.83 July 6756.38 2945.12 979,801.71 Aug 6736.14 2965.36 976,836.35 Sept 6715.75 2985.75 973,850.60 Oct 6695.22 3006.28 970,844.32 Nov 6674.55 3026.95 967,817.37 Dec 6653.74 3047.76 964,769.61 ________ ________
$81,187.61 $35,232.39
1988
End Beg Bal 12/31/87 Bal 1/1/88 964,769.61 x .006875
 Note x .006875/mo Int Total PMT of Receivable @ .0825/yr Income PMT Note Balance Rec
1988 Jan $961,700.90 6632.79 9701.50 3068.71 Feb 958,611.10 6611.69 " 3089.81 Mar 955,500.05 6590.45 " 3111.05 Apr 952,367.61 6569.06 " 3132.44 May 949,213.64 6547.53 " 3153.97 June 946,037.98 6525.84 " 3175.66 July 942,840.49 6504.01 " 3197.49 Aug 939,621.02 6482.03 " 3219.47 Sept 936,379.41 6459.89 " 3241.61 Oct 933,115.52 6437.61 " 3263.89 Nov 929,829.19 6415.17 " 3286.33 Dec 926,520.26 6392.58 " 3208.92
 9701.50 x 12
$78,168.65 $116,418 38,249.35
1989 CT Page 6866
 Interest Total Pmt of Note .0825/yr Income Pmt Note Receivable .006875/mo Receivable Balance
926,520.26 x .006875
Jan 6369.83 9701.50 3331.67 923,188.59 Feb 6346.92 " 3354.58 919,834.01 Mar 6323.86 " 3377.64 916,456.37 Apr 6300.64 " 3400.86 913,055.51 May 6277.26 " 3424.24 909,631.27 June 6253.71 " 3447.79 906,183.48 July 6230.01 " 3471.49 902,711.99 Aug 6206.14 " 3495.36 899,216.63 Sept 6182.11 " 3519.39 895,697.24 Oct 6157.92 " 3543.58 892,153.66 Nov 6133.56 " 3567.94 888,585.72 Dec 6109.03 " 3592.47 884,993.25
1990
 Interest Total Pmt of Note Income Pmt Note Receivable .006875/mo Receivable Balance
884,993.25
Jan 6084.33 9701.50 3617.17 881,376.08 Feb 6059.46 " 3642.04 877,734.04 Mar 6034.42 " 3667.08 874,066.96 Apr 6009.21 " 3692.29 870,374.67 May 5983.83 " 3717.67 866,657.00 June 5958.27 " 3743.23 862,913.77 July 5932.53 " 3768.97 859,144.80 Aug 5906.62 " 3794.88 855,349.92 Sept 5880.53 " 3820.97 851,528.95 Oct 5854.26 " 3847.24 847,681.71 Nov 5827.81 " 3873.69 843,808.02 Dec 5801.18 " 3900.32 839,907.70 _______ _________ _______ __________
71,332.45 116,418 45,085.55 839,907.70
1991
 Interest Total Pmt of Note Rate Income Pmt Note Receivable .006875/mo Receivable Balance CT Page 6867 839,907.70
Jan 5774.37 9701.50 3927.13 835,980.57 x .006875 Feb 5747.37 " 3954.13 832,026.44 Mar 5720.18 " 3981.32 828,045.12 Apr 5692.81 " 4008.69 824,036.43 May 5665.25 " 4036.25 820,000.18 June 5637.50 " 4064.00 815,936.18 July 5609.56 " 4091.94 811,844.24 Aug 5581.43 " 4120.07 807,724.17 Sept 5553.10 " 4148.40 803,575.77 Oct 5524.58 " 4176.92 799,398.85 Nov 5495.87 " 4205.63 795,193.22 Dec 5466.95 " 4234.55 790,958.67 ________ _______ _______ __________
67,468.97 116,418 48,949.03 790,958.67
1992
 Interest Total Pmt of Note Rate Income Pmt Note Receivable .006875/mo Receivable Balance
790,958.67 Jan 5437.84 9701.50 4263.66 786,695.01 Feb 5408.53 " 4292.97 782,402.04 Mar 5379.01 " 4322.49 778,079.55 Apr 5349.30 " 4352.20 773,727.35 May 5319.38 " 4382.12 769,345.23 June 5289.25 " 4412.25 764,932.98 July 5258.91 " 4442.59 760,490.39 Aug 5228.37 " 4473.13 756,017.26 Sept 5197.62 " 4503.88 751,513.38 Oct 5166.65 " 4534.85 746,978.53 Nov 5135.48 " 4566.02 742,412.51 Dec 5104.09 " 4597.41 737,815.10 ________ _______ _______ __________
63,274.43 116,418 53,143.57 737,815.10
1993
 Interest Total Pmt of Note Rate Income Pmt Note Receivable .006875/mo Receivable Balance
737,815.10 Jan 5072.48 9701.50 4629.02 733,186.08 Feb 5040.65 " 4660.85 728,525.23 Mar 5008.61 " 4692.89 723,832.34 CT Page 6868 Apr 4976.35 " 4725.15 719,107.19 May 4943.86 " 4757.64 714,349.55 June 4911.15 " 4790.35 709,559.20 July 4878.22 " 4823.28 704,735.92 Aug 4845.06 " 4856.44 699,879.48 Sept 4811.67 " 4889.83 694,989.65 Oct 4778.05 " 4923.45 690,066.20 Nov 4744.21 " 4957.29 685,108.91 Dec 4710.12 " 4991.38 680,117.53 __________ _________ _______ __________
58,720.43 116,418 57,697.57
1994
 Interest Total Pmt of Note Rate Income Pmt Note Receivable .006875/mo Receivable Balance
680,117.53 Jan 4675.81 9701.50 5025.69 675,091.84 Feb 4641.26 " 5060.24 670,031.60 Mar 4606.47 " 5095.03 664,936.57 Apr 4571.44 " 5130.06 659,806.51 May 4536.17 " 5165.33 654,641.18 June 4500.66 " 5200.84 649,440.34 July 4464.90 " 5236.60 644,203.74 Aug 4428.90 " 5272.60 638,931.14 Sept 4392.65 " 5308.85 633,622.29 Oct 4356.15 " 5345.35 628,276.94 Nov 4319.40 " 5382.10 622,894.84 Dec 4282.40 " 5419.10 617,475.74 __________ _________ _______ __________
53,776.21 116,418 62,641.79

1995 Interest Total Pmt of Note Rate Income Pmt Note Receivable .006875/mo Receivable Balance
617,475.74 Jan 4245.00 9701.50 5456.50 612,019.24 Feb 4207.63 " 5493.87 606,525.37 Mar 4169.86 " 5531.64 600,993.73 Apr 4131.83 " 5569.67 595,424.06 May 4093.54 " 5607.96 589,816.10 June 4054.99 " 5646.51 584,169.59 July 4016.17 " 5685.33 578,484.26 Aug 3977.08 " 5724.42 572,759.84 CT Page 6869 Sept 3937.72 " 5763.78 566,996.06 Oct 3898.10 " 5803.40 561,192.66 Nov 3858.20 " 5843.30 555,349.36 Dec 3818.03 " 5883.47 549,465.89 __________ _______ _______ __________
48,408.15 116,418 68,009.85
1996
 Interest Total Pmt of Note Rate Income Pmt Note Receivable .006875/mo Receivable Balance
549,465.89 Jan 3777.58 9701.50 5923.92 543,541.97 Feb 3736.85 " 5964.65 537,577.32 Mar 3695.84 " 6005.66 531,571.66 Apr 3654.56 " 6046.94 525,524.72 May 3612.98 " 6088.52 519,436.20 June 3571.12 " 6130.38 513,305.82 July 3528.98 " 6172.52 507,133.30 Aug 3486.54 " 6214.96 500,918.34 Sept 3443.81 " 6257.69 494,660.65 Oct 3400.79 " 6300.71 488,359.94 Nov 3357.47 " 6344.03 482,015.91 Dec 3313.86 " 6387.64 475,628.27 __________ _________ _______ __________
42,580.38 116,418 73,837.62
1997
 Interest Total Pmt of Note Rate Income Pmt Note Receivable .006875/mo Receivable Balance
475,628.27 Jan 3269.94 9701.50 6431.56 469,196.71 Feb 3225.73 " 6475.77 462,720.94 Mar 3181.21 " 6520.29 456,200.65 Apr 3136.38 " 6565.12 449,635.53 May 3091.24 " 6610.26 443,025.27 June 3045.80 " 6655.70 436,369.57 July 3000.04 " 6701.46 429,668.11 Aug 2953.97 " 6747.53 422,920.58 Sept 2907.58 " 6793.92 416,126.66 Oct 2860.87 " 6840.63 409,286.03 Nov 2813.84 " 6887.66 402,398.37 Dec 2766.49 " 6935.01 395,463.36 CT Page 6870 __________ _________ _______ __________
36,253.09 116,418 80,164.91
1998
 Interest Total Pmt of Note Rate Income Pmt Note Receivable .006875/mo Receivable Balance
395,463.36 Jan 2718.81 9701.50 6982.69 388,480.67 Feb 2670.80 " 7030.70 381,449.97 Mar 2622.47 " 7079.03 374,370.94 Apr 2573.80 " 7127.70 367,243.24 May 2524.80 " 7176.70 360,066.54 June 2475.46 " 7226.04 352,840.50 July 2425.78 " 7275.72 345,564.78 Aug 2375.76 " 7325.74 338,239.04 Sept 2325.39 " 7376.11 330,862.93 Oct 2274.68 " 7426.82 323,436.11 Nov 2223.62 " 7477.88 315,958.23 Dec 2172.21 " 7529.29 308,428.94 __________ ________ _______ __________
29,383.58 116,418 87,034.42
1999
 Interest Total Pmt of Note Rate Income Pmt Note Receivable .006875/mo Receivable Balance
308,428.94 Jan 2120.45 9701.50 7581.05 300,847.89 Feb 2068.33 " 7633.17 293,214.72 Mar 2015.85 " 7685.65 285,529.07 Apr 1963.01 " 7738.49 277,790.58 May 1909.81 " 7791.69 269,998.89 June 1856.24 " 7845.26 262,153.63 July 1802.31 " 7899.19 254,254.44 Aug 1748.00 " 7953.50 246,300.94 Sept 1693.32 " 8008.18 238,292.76 Oct 1638.26 " 8063.24 230,229.52 Nov 1582.83 " 8118.67 222,110.85 Dec 1527.01 " 8174.49 213,936.36 __________ _________ _______ __________
21,925.42 116,418 94,492.58 CT Page 6871
2000
 Interest Total Pmt of Note Rate Income Pmt Note Receivable .006875/mo Receivable Balance
213,936.36 Jan 1470.81 9701.50 8230.69 205,705.67 Feb 1414.23 " 8287.27 197,418.40 Mar 1357.25 " 8344.25 189,074.15 Apr 1299.88 " 8401.62 180,672.53 May 1242.12 " 8459.38 172,213.15 June 1183.97 " 8517.53 163,695.62 July 1125.41 " 8576.09 155,119.53 Aug 1066.45 " 8635.05 146,484.48 Sept 1007.08 " 8694.42 137,790.06 Oct 947.31 " 8754.19 129,035.87 Nov 887.12 " 8814.38 120,221.49 Dec 826.52 " 8874.98 111,346.51 __________ ________ _______ __________
13,828.15 116,418 102,589.85
2001
 Interest Total Pmt of Note Rate Income Pmt Note Receivable .006875/mo Receivable Balance
111,346.51 Jan 765.51 9701.50 8935.99 102,410.52 Feb 704.07 " 8997.43 93,413.09 Mar 642.21 " 9059.29 84,353.80 Apr 579.93 " 9121.57 75,232.23 May 517.22 " 9184.28 66,047.95 June 454.08 " 9247.42 56,800.53 July 390.50 " 9311.00 47,489.53 Aug 326.49 " 9375.01 38,114.52 Sept 262.04 " 9439.46 28,675.06 Oct 197.14 " 9504.36 19,170.70 Nov 131.80 " 9569.70 9,601.00 Dec 100.50 " 9601.00 -0- __________ ________ _______ __________
5,071.49 116,418 111,346.51 CT Page 6872